UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| PETER PAN BUS LINES, INC., *et al.* )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>FUNG WAH BUS )<br>   TRANSPORTATION, INC., *et al.* )<br>)<br>Defendants )<br>) | CIVIL ACTION<br>NO. 04CV-<br><br>04    JLT |

**Affidavit of Robert Schwarz, Executive Vice President
Plaintiff Peter Pan Bus Lines, Inc.
<u>In Support of Plaintiffs' Motion for Preliminary Injunction</u>**

**Introduction**

1.    I am Robert Schwarz, Executive Vice President of Plaintiff Peter Pan Bus Lines, Inc. ("Peter Pan"). Peter Pan is a Massachusetts corporation whose principal place of business is 1776 Main Street, Springfield, Massachusetts 01102.

2.    As Peter Pan's Executive Vice President, my duties and responsibilities include overall responsibility for many aspects of Peter Pan's business. In particular, I have been involved for many months in assessing what Peter Pan believes to be the illegal competition posed by Defendants Fung Wah and Travel Pack. I am authorized on behalf of Peter Pan to submit this affidavit in support of Plaintiffs' request for Preliminary Injunction filed in this case against those two companies. This statement is based on my

personal knowledge, except as I have indicated otherwise where other Peter Pan personnel have provided me with information at my direct request.

3. I have been associated with Peter Pan for 18 years and during that time, I have been actively engaged in bus industry and trade association activities. My statement is based, in part, on my experience with Peter Pan and within the bus industry.

## Peter Pan Bus Lines

4. Peter Pan is an intercity, interstate bus company, whose primary business is operating regularly scheduled intercity bus service over regular routes, generally throughout New England and the Middle Atlantic States. Peter Pan's route system extends from Boston on the North to Albany, New York on the West, and Washington, DC on the South, including service to major intermediate cities such as New York, New York, Hartford, Connecticut, Philadelphia, Wilmington, Delaware, and Baltimore, Maryland.

5. As an interstate bus company, Peter Pan's business is highly regulated by the Federal Motor Carrier Safety Administration ("FMCSA"), both as to the routes over which the company may operate and the nature of its services. As to routes, Peter Pan conducts its regularly scheduled service under Certificates originally issued by the Interstate Commerce Commission or "ICC" (the predecessor agency to FMCSA) in Docket MC-61016. The award of such Certificates was years ago known as "holding operating authority." It is now known as "registration."

6. As it relates to this lawsuit, Peter Pan now and for many years has provided regularly scheduled bus service between Boston and New York City. Attached as **Exhibit A** is a copy of the Peter Pan Certificate in MC-61016 (Sub 64) issued October 25, 1984, which authorizes such service. (New York City is an intermediate point on the route from Boston to Atlantic City.) Attached as **Exhibit B** is a copy of the Peter Pan Certificate in MC-61016 (Sub 70) issued May 20, 1991, which authorizes regular route service between New York City and Washington, DC. This is not involved in this case, but the Certificate is another example of a regular route certificate. As can be seen from these two certificates, each expressly makes reference to operations "over regular routes," and each specifies the highways over which such operations are to be conducted.

7. As I shall explain, "regular route" authority differs significantly from "charter and special" authority. Attached as **Exhibit C** is a copy of the Peter Pan Certificate in MC-61016 (Sub 62), issued February 4, 1983, which authorizes "charter and special operations" service over "irregular routes." This Certificate does not specify particular highways over which operations are to be conducted. As the "irregular routes" terminology suggests, operations may be conducted over any highways the carrier chooses, presumably with a different route for each trip.

8. To further illustrate the difference between "regular route" and "charter and special operations" authority with more current examples, I have attached two very current FMCSA certificates issued by FMCSA to a Peter Pan affiliated company, Peter Pan Boston, LLC, in early 2003. These show FMCSA continues to recognize this

distinction. **Exhibit D** is a one page Certificate issued in Docket MC-448482 on February 11, 2003. On its face, this certificate authorizes transportation "in charter and special operations." **Exhibit E** is a two page Certificate issued in Docket MC-448482 on February 11, 2003. On its face, this Certificate authorizes "regular route" transportation. I shall make reference to these certificates later in my statement.

9.  Peter Pan operates its regular route service according to published schedules, made available both in printed form and on the Peter Pan website <*www.peterpanbus.com*>. Attached as **Exhibit F** is a copy of pertinent pages from the current Peter Pan printed timetable which described its scheduled services between Boston and New York City, some of which are "express" services between these two cities only (Schedule 105F) and others of which serve more intermediate points (Schedule 7048). Peter Pan currently operates 13 daily scheduled trips between Boston and New York City, and on each Friday and Sunday, it operates 23 scheduled trips.

### Defendants' Operation in Clear Violation of the Law

10.  I understand from counsel that the legal standard for seeking relief is that defendants are providing transportation in clear violation of the FMCSA laws relating to registration. Based on the following, I believe they are.

### Defendants' FMCSA Registration

11.  My company has investigated the FMCSA's public records to determine the nature of Defendants' registration with that agency. Our investigation shows that each Defendant is registered as an interstate bus company, but each Defendant is registered

only to provide "charter and special operations" transportation. Neither Defendant is registered to engage in regularly scheduled, "regular route" bus transportation service between Boston and New York City.

12. We have obtained from FMCSA a statement which says the only FMCSA registration held by Defendant Fung Wah is that in Certificate MC-405969, issued February 4, 2002; the FMCSA statement includes a copy of that Certificate. The FMCSA statement and Fung Wah Certificate are attached as **Exhibit G.** This registration, by its express terms, permits transportation of passengers only in "charter and special operations" service. It does not authorize "regular route" transportation.

13. We have obtained from FMCSA a similar statement which says the only FMCSA registration held by Defendant Travel Pack (its legal name is "Kristine Travel and Tours, Inc.") is that in Certificate MC-352543, issued March 1, 1999, which includes a copy of that Certificate. The FMCSA statement and Travel Pack Certificate are attached as **Exhibit H.** This registration permits transportation of passengers only in "charter and special operations" service. It does not authorize "regular route" transportation.

## Defendants' Operation of Regular Route Service

14. From many years of bus industry experience, I know the difference between "regular route" transportation and "charter and special operations" transportation. While I understand Plaintiffs' legal memorandum will explain the difference in legal terms, I

shall explain it in operational terms, with reference both to Defendants' operations and to Peter Pan's operations.

15. As far back as I know, bus interstate "regular route" operations had certain characteristics. First, to perform such service, a carrier was required to hold authority or be registered with the regulatory agency to operate such regular route service. Peter Pan operates its regular route service pursuant to such certificates. (*See* Exhibit A) FMCSA continues to issue "regular route" certificates to permit regular route transportation. (*See* Exhibit E) These certificates use the words "regular route" and specify highways over which operations are to be conducted. As can be seen by comparing Defendants' certificates with these others, it is clear neither of Defendants' Certificates (Exhibits G and H) authorize "regular route" service.

16. "Regular route" operations are performed between specified terminal points. As shown by its schedules (Exhibit F), Peter Pan operates, in part, between Boston and New York City. As shown in Defendants' promotional material I shall describe, each defendant holds itself out to perform service between the terminus points of Boston and New York City.

17. Regular route transportation is performed according to published schedules. Peter Pan operates according to its published schedule (Exhibit F). Each Defendant also operates according to published schedules, published in printed form and also available on the Internet as I shall explain.

18.     Peter Pan, by its long time status as a major bus carrier in Boston, has generally been aware that Defendants' have been engaged in regular route operations between Boston and New York City for some time, at least five years if not longer. I see the Fung Wah website says it has been operating the service for 8 years.

19     In connection with preparing my statement, I directed a senior Peter Pan consultant, Mr. Michael Sharff, to observe the current conduct of the Defendants' regular route service. He reported that both companies appear actively to be engaged in regular route service between Boston and New York City.

20.     On April 30, 2004, Mr. Sharff went to the Crown Royal Bakery, 68 Beach Street in Boston. On the awning over the front of the bakery is a sign which says on one line, "Fung Wah Bus Ticket Booth" and on the next line, "Boston - New York." There is another sign on the front of the building which says "Boston - New York" on one line and beneath that "Bus Ticket Booth." That sign includes what appear to be a number of Chinese characters. He walked into the bakery and asked the individual there "Can I have a schedule for the bus to New York?" The individual behind the counter there gave him a single sheet schedule, with schedule information on the front and maps on the reverse, a copy of which is attached as **Exhibit I.** (The front of the schedule shows the Crown Royal Bakery as the address for the company in Boston.) After looking over the schedule, Mr. Sharff then asked, "Can I have a ticket for the next bus to New York?" The agent responded by saying "Ten dollars, next bus at 4:30 pm around corner." Mr.

Sharff paid him $10.00 and the agent then gave him ticket no. 11303, which is attached as **Exhibit J**.

21.     On the same day, April 30, 2004, Mr. Sharff went to the Travel Pack ticket window at 42B Harrison Ave., Boston which had a sign indicating it was an agent for bus service. He asked the individual there "Can I have a schedule for the bus to New York?" The individual behind the window there gave him a single sheet schedule, with schedule information on the front and maps on the reverse, a copy of which is attached as **Exhibit K.** (The front of the schedule shows this Harrison Ave. address as the address for the company in Boston.) After looking over the schedule, Mr. Sharff then asked, "Can I have a ticket for the next bus to New York?" The agent responded by saying "Ten dollars, next bus at 3:00 pm across street." Mr. Sharff paid him $10.00 and the agent then gave him ticket no. 13568, which is attached as **Exhibit L**.

22.     Next, Mr. Sharff observed some Fung Wah arrivals and departures on April 30 and May 2, 2004. He observed three departures. Each departed from a curbside location diagonally across the street from 11 Avenue de Lafayette in downtown Boston. The location was marked only by a city traffic sign which says "Tour Bus Parking." On April 30, 2004, he observed the 4:00 pm departure and the 4:30 pm departure. Both left at approximately the scheduled time. Each appeared to be carrying approximately 40 passengers. On the first departure, the driver said "New York, 4:00 o'clock tickets only." On the second, the driver said only "New York." On May 2, 2004, Mr. Sharff observed the 3:30 departure from the same location. For each of the three departures, there was a

bus with the name "Fung Wah Bus" written in large letters. In small letters, where FMCSA regulations require the operator to show its name and identification numbers, each bus said "Fung Wah Bus, MC-405969-C, USDOT 954187." The 4:00 pm April 30 departure was on a bus marked "#72" with Massachusetts Bus license plate 18041. The 4:30 pm April 30 departure was on a bus marked "#38" with Massachusetts Bus license plate 16329. The 3:30 pm May 2 departure was on a bus with Massachusetts Bus license plate 17456.

23.   Mr. Sharff also observed three arrivals. On April 30, 2004 he observed the arrival of one schedule at 2;30 pm and another at 4:45 pm. On May 2, 2004, he observed an arrival at 2:45 pm. All three buses unloaded at the same location where the others had loaded. All three were marked with the same name and numbers as those he saw depart. The 2:30 pm April 30 arrival was on a bus marked "#60" with Massachusetts Bus license plate 18036. It appeared to be carrying approximately 55 passengers. The 4:45 pm April 30 arrival was on a bus marked "#70" with Massachusetts Bus license plate 4681. It appeared to be carrying approximately 35 passengers. The 2:45 pm May 2 arrival was on a bus marked #70 with Massachusetts Bus license plate 4681. It appeared to be carrying approximately 40 passengers.

24.   Mr. Sharff also observed some Travel Pack arrivals and departures on April 30 and May 2, 2004. He observed three departures. Each departed from a curbside location diagonally across the street from 11 Avenue de Lafayette in downtown Boston. The location was marked only by a city traffic sign which says "Tour Bus Parking." On

each of the three departures, passengers had gathered across from the ticket booth on Harrison Ave., and an employee of some sort led the passengers to the bus boarding area. On April 30, 2004, he observed the 5:00 pm departure, which left at approximately the scheduled time. It appeared to be carrying approximately 45 passengers. The driver said "New York bus." On May 2, 2004, Mr. Sharff observed the 3:00 pm and 5:00 pm departures from the same location, both of which left at approximately the scheduled time. For the 5:00 pm April 30 and 3:00 pm May 2 departures, there was a bus with the name "Travel Pack" written in large letters. The bus for the third departure did not have any large lettering. On all three buses, in small letters, where FMCSA regulations require the operator to show its name and identification numbers, each bus said "Kristine Travel, MC-352543, USDOT 789704," except the bus on the 5:00 pm April 30 departure did not show any USDOT number. The 5:00 pm April 30 departure was on a bus marked "#885" with Massachusetts Bus license plate 13899. The 3:00 pm May 2 departure was on a bus marked "#881" with Massachusetts Bus license plate 15704. The 5:00 pm May 2 departure was on a bus marked "#883" with Massachusetts Bus license plate 13900.

25.    Mr. Sharff also observed three Travel Pack arrivals. On April 30, 2004 he observed the arrival of one schedule at 4:45 pm. On May 2, 2004, he observed an arrival at 3:20 pm and at 4:45 pm.. All three buses unloaded at the same location where the others had loaded. All three were marked with the same name and numbers as those he saw depart. The 4:45 pm April 30 arrival was on a bus marked "#883" (described above). It appeared to be carrying approximately 35 passengers. The 3:20 pm May 2 arrival was

on a bus marked "#882" with Massachusetts Bus license plate 15701. It had the same "Travel Pack" name in large letters and "Kristine Travel" and the "MC" and "USDOT" numbers in small lettering as the other buses. It appeared to be carrying approximately 50 passengers. The 4:45 pm May 2 arrival was on a bus marked "#883" (described above). It appeared to be carrying approximately 45 passengers

26.     Peter Pan also looked at the websites maintained by Defendants. Attached as **Exhibit M** is a copy of multiple pages from the Fung Wah Bus website <*www.fungwahbus.com*> which shows its Boston - New York service. Attached as **Exhibit N** is a copy of a page from the Travel Pack website <*www.travelpackusa.com*> which prominently advertises its 18 daily schedules between Boston and New York.

27.     The Fung Wah pages (Exhibit M) say Fung Wah has been providing this service for 8 years. The first page says "Fun Wah Bus service is permsitted [sic] by Federal Highway Administration." The Federal Highway Administration was the U.S. Department of Transportation agency which regulated interstate bus service prior to the creation of FMCSA. However, Fung Wah's registration (*See* Exhibit G) was with FMCSA. I presume Fung Wah makes this statement in an effort to mislead the public into thinking it is properly registered. I also point out the use of what I believe is the official U.S. Department of Transportation logo on the first page of the website. The remaining pages only show the schedule.

28.     The Travel Pack page (Exhibit N) does list "Travel Packages" of multiday trips to places like Washington, D.C., Niagara Falls, etc. That's the type of bus service

ordinary performed under "charter and special operations" authority. I say that based on Peter Pan's holding "charter and special operations" authority and operating those sorts of special event and tour trips under that authority.

### Peter Pan's Injury From Defendants' Unauthorized Competition

29. The information I have supplied makes it quite clear both Defendants have been operating scheduled service in competition with Peter Pan. This unauthorized operation has injured Peter Pan in a number of ways, as I shall explain.

30. First, I stress that we are seeking here an immediate injunction against Defendants, because every day they operate, they divert more passengers from Peter Pan and lessen Peter Pan' profits, but there is no feasible way for Peter Pan to identify precisely the exact monetary harm we are suffering as Defendants continue to operate their services. With Peter Pan's knowledge of the market, we believe that many if not most of the passengers who ride Defendants' services would ride Peter Pan's service if Defendants' services were not available.

31. As a part of our business, Peter Pan conducts passenger counts. Based on passenger counts conducted over time in the ordinary course of its business, Peter Pan has found it operates at less than capacity on most all of its scheduled trips between Boston and New York. Since it was operating at less than capacity, it could have carried more passengers on the same trip with virtually no additional marginal cost. Peter Pan operates its schedules regardless of passenger load, so for each trip it operated, a substantial percentage of each additional fare it collected from another passenger on that trip would

have been profit. This profit helps to offset losses when scheduled trips operate with a very low load capacity. For each passenger which Defendants carried who would otherwise have traveled with Peter Pan, Peter Pan is harmed by the diversion of the lost revenue and lost profit. Peter Pan believes this scenario continues each day Defendants continue to operate. Without some specific measurement of damages, Peter Pan's only meaningful relief is to have Defendants discontinue their unauthorized operations.

32.  Peter Pan's profit is important, because Peter Pan has made a substantial investment in order to operate its regular route service. Peter Pan has invested in one of the largest fleets of intercity buses of any privately owned carrier. Modern intercity buses today cost at least $390,000 each. Peter Pan now has 118 in its fleet. Peter Pan has invested in attracting, training, and maintaining quality bus drivers, who meet Peter Pan's standards and the standards of the Federal Motor Carrier Safety Regulations. Similarly, Peter Pan has invested in attracting, training, and maintaining quality customer service employees, as supervisors, mechanics, in its information centers, and in the terminals it operates. Peter Pan has invested in establishing and maintaining a company wide safety program to assure safest possible operations, including its own safety department. Peter Pan has invested not only in mechanics, but also maintenance facilities and maintenance programs, to assure safe and efficient operation of its business. Peter Pan has invested in the operation of terminal facilities throughout its system. Peter Pan has invested heavily in promoting its services, beginning with the expensive, highly distinctive paint schemes on its buses to all manner of promotional activity. All of these

programs are expensive and add to Peter Pan's overhead, but all go toward better service for the traveling public. Any diversion of revenue and profit by unauthorized competitors such as Defendants harms Peter Pan's investments as described here.

### Possible Harm to Defendants

33. I understand that one issue the Court must view is the possible harm to the Defendants from granting an injunction. I don't know much about the defendants, but I can offer two comments. First, it seems to Peter Pan that whatever harm Defendants may suffer is only a result of having to stop an operation which we believe is being performed without an appropriate government registration. It doesn't seem that a person is "harmed" if he must stop operating in violation of a law.

34. I also point out that even if Defendants stop operating, it is not clear they will suffer any meaningful economic harm. Peter Pan does not know Defendants' cost structure, but we do know the cost of buses, the cost of insurance, the cost of fuel, and the cost of drivers, just to name a few expenses common to any bus company. Calculating the fares at which Defendants operate ad the capacity of their vehicles (and taking into account our own decades of experience in the bus business), Peter Pan would expect that Defendants' operating profits (i.e., the amount by which passenger revenue exceeds operating expenses) would be very, very small, and that is before taking into account overhead expenses, the greatest of which would be acquisition of buses and insurance. In other words, although Defendants would lose revenue if an injunction was issued, it is unlikely they would lose any meaningful profit.

## Verification

    I, Robert Schwarz, Executive Vice President of Plaintiff Peter Pan Bus Lines, Inc., verify under penalty of perjury under the laws of the United States of America, that I have read the foregoing statement, that I am qualified and authorized to make that statement, and that all the information therein is true and correct to the best of my information and belief.

                                                                               Robert Schwarz

Dated:   May 10, 2004