UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| PETER PAN BUS LINES, INC., *et al.* | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CIVIL ACTION NO. 04- |
| FUNG WAH BUS TRANSPORTATION INC., *et al.* | ) ) ) | |
| Defendants | ) ) ) ) | |

*04 ⸻ JLT*

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF APPLICATION
## FOR PRELIMINARY INJUNCTIVE RELIEF

Two regular route, intercity bus companies are making use of the "private

enforcement" mechanism in the federal Motor Carrier Act to seek an immediate halt to

unauthorized competition from two unregistered bus company competitors.  Plaintiffs

Peter Pan Bus Lines and Greyhound Lines, two established, regular-route intercity bus

companies, pursuant to Fed.R.Civ.P.65(a), ask the Court to issue a Preliminary Injunction

in connection with their Complaint against Defendants Fung Wah Bus and Kristine

Travel, doing business as Travel Pack, to enjoin immediately these two Defendants from

continuing to flout federal laws governing the operation of intercity, regularly scheduled

bus transportation.

Plaintiffs ask for court action based on federal statute which allows and federal policy which encourages properly registered bus companies to enforce the federal requirement that any companies providing such service be properly registered with the Federal Motor Carrier Safety Administration ("FMCSA").

At its heart, issuing a preliminary injunction is equitable relief, and there are four acknowledged criteria a plaintiff must satisfy before any injunction is issued, *infra*. Each of the four is relevant, but the crux of this action is the "public interest" criterion, a "public interest" which in this case has been defined by Congress. For nearly 70 years, Congress has legislated that the public interest requires intercity bus companies to register with the federal administrative agency charged with regulating them. Both Defendants are operating intercity, regular scheduled bus service in competition with Plaintiffs, and neither is properly registered to do so. Confronting the public policy issue of competition to regular route carriers like Plaintiffs posed by unregistered carriers like Defendants, the Interstate Commerce Commission has said,

> At the outset, we wish to emphasize that the establishment and protection of the regular-route motorbus industry is of primary importance to the national transportation policy. This Commission has firmly and consistently held that service provided by the regular-route passenger carriers is vital to the Nation. The public interest and this Commission demand that adequate motorbus service be available to meet the daily needs of the traveling public, and we are willing to take whatever action necessary to insure this objective. [1]

---

[1] *Passenger Transportation in Special Operations*, 112 M.C.C. 160, 171 (1970). The ICC was the federal agency which at that time regulated motor carrier transportation. Although the ICC was ultimately abolished by the ICC Termination Act of 1995, Pub.L. 104-88, section 204(a) of that Act provides that all "orders, determinations, rules," etc. of the ICC remain in effect until modified or set aside. All decisions of the ICC cited herein, remain effective. Copies of all the ICC "Motor Carrier Cases" decisions cited in this Memorandum are set out for convenience in the attached Appendix.

Congress has also legislated that the public interest encourages properly registered carriers to act in "private enforcement" of the registration requirements through court action by reliance on 49 U.S.C. §14707, *infra*, "to afford injured parties a measure of self-protection against operations which are openly and obviously unlawful." *Bethke v. Edson Express, Inc.*, 459 F.Supp. 1374, 1381 (D.Colo. 1978)

Thus, in seeking their relief here, Plaintiffs are acting in the manner which Congress has decreed is in the public interest - a "public interest" defined by statute and federal administration, not by the usual weighing of the equities. [2]

The Criteria for Issuing a Preliminary Injunction

There are four criteria which a Plaintiff must satisfy for issuance of a preliminary injunction request brought under Federal Rule 65(a). Plaintiffs must show (1) they will suffer irreparable injury if the injunction is not granted, (2), that such injury outweighs any harm to defendants from issuing an injunction, (3) a likelihood of success on the merits; and (4) the public interest will not be adversely affected by granting the injunction. *Planned Parenthood League of Massachusetts v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir. 1981) [quoting *Women's Community Health Center, Inc. v. Cohen*, 477 F.Supp. 542, 544 (D. Me. 1979)], *cert. denied* 455 U.S. 921 (1982).

---

[2] Congressional concern with operating beyond the scope of one's registration has not waned over the years. In 1999, Congress amended 49 U.S.C. §13902, the FMCSA "registration" statute, to provide as a new ¶(e), "In addition to other penalties available under the law, motor carriers that fail to register their operations as required by this section or that operate beyond the scope of their registrations" may be subject to additional penalties, including out-of-service orders. This recent statutory change reflects ongoing Congressional policy that operating "beyond the scope of their registrations" is equated with operating without registration; both are a clear violation of the "registration" requirement and should subject the violator to penalty.

As will be shown Plaintiffs meet all four criteria. The Peter Pan and Greyhound supporting affidavits describe Plaintiffs' irreparable harm caused by Defendants' ongoing illegal operations. The same affidavits suggest injury to Defendants will be slight - and any harm results only from their discontinuing activities prohibited by law. Plaintiffs show virtually certain success on the merits. Plaintiffs are only seeking the "public interest" determination consistent with established Congressional policy in this field.

Plaintiffs will address each of the four criteria; they begin with special consideration of the "private enforcement statute, §14707, under which they bring their claim, and their likelihood of success on the merits under that statute.

The "Private Enforcement" Statute - Success on the Merits

Plaintiffs bring this action based on 49 U.S.C. §14707, which allows for the private enforcement of FMCSA registration requirements. It provides,

> (a) In General. If a person provides transportation by motor vehicle or service in clear violation of section 13901-13904 or 13906, a person injured by the transportation or service may bring a civil action to enforce any such section. In a civil action under this subsection, trial is in the judicial district in which the person who violates that section operates.

The history and public policy underlying the statute are set out in *Baggett Transportation Company v. Hughes Transportation, Inc.*, 393 F. 2d 710 (8th Cir. 1968), *cert. denied*, 393 U.S. 936 (1968). The Court there analyzed the 1965 amendment to the Motor Carrier Act, which for the first time created a private right for competing carriers on their own to enforce the ICC's registration requirements, adding at 714-15,

> An analysis of the 1965 amendment and its purposes and objectives would seem to be called for. 49 U.S.C.A. § 322(a), (b) [the predecessor to §14707] as it existed prior to the

4

1965 amendment limited enforcement actions to the [Interstate Commerce] Commission itself or its duly authorized agent who could apply to the District Court of the United States for any District where such carrier or broker operates for enforcement. It seems obvious that the Congress, by the passage of § 322(b)(2), effective September 6, 1965, sought to enlarge the number of persons who could seek enforcement in the District Court to include any person injured by clear and patent violations of any of the provisions of [the registration requirements]. As already referred to supra, this particular section is designed to "afford injured parties a measure of self-protection against operations which are openly and obviously unlawful." 1965 U.S. Code Cong. & Adm. News, Vol. 2, at p. 2931.

Under the statute, Plaintiffs must show (1) Defendants are in "clear violation" of FMCSA registration requirements, and (2) Plaintiffs are injured thereby. As to the first showing, Defendants are registered with FMCSA to perform "charter and special operations" services, but the services they are performing in competition with Peter Pan and Greyhound are classified under the regulatory scheme as "regular route" and therefore beyond the scope of their registrations. Defendants clearly are not registered to provide "regular route" service. As to the second showing, Plaintiffs are harmed by the ongoing diversion of passengers from their services to the unlawful, competitive services performed by Defendants.

FMCSA's registration requirements in 49 U.S.C. §13901 provide a person [3] transporting passengers in interstate commerce [4] may do so "only if the person is

---

[3] "Person" is defined in 1 U.S.C. 1 to include a corporation, such as Defendants.

[4] FMCSA's jurisdiction over interstate passenger transportation appears in 49 U.S.C. §13501(1)(A), which defines FMCSA's jurisdiction over the transportation of passengers "between a place in a State and a place in another State." The transportation at issue in this case is that between Boston, Massachusetts and New York, New York, which is clearly interstate and subject to FMCSA jurisdiction.

registered under this chapter to provide the transportation or service." With respect to motor carriers, §13902 sets forth the specific requirements for registration.

### Clear Violation of FMCSA Registration Requirements

Both Defendants are operating in clear violation of FMCSA registration requirements. Both Defendants hold themselves out to operate and do operate daily, scheduled, direct bus service between Boston and New York City, available to any person who presents himself for transportation; this service is described for regulatory purposes as "regular route" service. Each Defendant is registered with FMCSA, but not to perform the "regular route" class of service each is performing daily.

The "clear violation" standard flows from more than 70 years of federal regulation of intercity bus transportation. This federal regulation dates from the Motor Carrier Act of 1935 administered by the Interstate Commerce Commission ("ICC"), and it continues to the present. The ICC Termination Act of 1995 (Pub.L. 104-88) abolished the ICC, but continued federal regulation, first under administration of the Federal Highway Administration ("FHWA") and since the Motor Carrier Safety Improvement Act of 1999 (Pub.L. 106-159) under the FMCSA.

A traditional essential feature of federal carrier regulation has been the requirement that those engaged in interstate transportation be registered, [5] which dates back to the 1935 Motor Carrier Act itself. The "private enforcement" concept dates back

---

[5] In early days, this was referred to as "holding authority"; after ICCTA it is referred to as being "registered."

almost 40 years to a 1965 amendment to the Motor Carrier Act; until then, only the ICC

could seek injunctive relief if a carrier operated without the requisite authority. *Transport*

*of New Jersey v. Greyhound Lines, Inc.*, 463 F.Supp. 1117, 1119 (D.D.C. 1979).   Even

during the time the ICC itself was actively enforcing the law, the predecessor of §14707

(first known as 49 U.S.C. §322(b)(2) and later as 49 U.S.C. §11708) allowed for the same

private enforcement by registered carriers against those competitors who failed to adhere

to the then ICC's registration requirements.

Today's §14707 differs from the predecessor statutes in only one significant

respect.  While the terms of the statute have not changed substantively, under today's

regulatory environment, FMCSA's stated policy is to maintain a "hands off" approach to

inter-carrier disputes; instead of having parties file a complaint with FMCSA to resolve

disputes, the agency instead encourages private parties to make use of the courts to seek

to enforce their rights, as Plaintiffs are doing here.  The Court in *Greyhound Lines, Inc. v.*

*Monroe Bus Corp.* 2004 WL 605201 (D.D.C. March 26, 2004), faced with a somewhat

similar case, cited a policy statement by FHWA,[6] then the regulatory agency, under a

closely related statute, 49 U.S.C. §14704:

> . . . an injured party may seek both damages and injunctive relief against a motor carrier
> in federal court to redress violations of [the Act] . . . DOT should not allocate its scarce
> resources to resolving essentially private disputes, and that the right of private
> enforcement "will permit these private disputes to be resolved the way that all other
> commercial disputes are resolved - by the parties" *See* 63 Fed. Reg. 31827, 31828 (June
> 10, 1998) (internal citation omitted).

---

[6] A copy of the *Federal Register* notice appears in the Appendix.

FMCSA has been notified of this complaint as required by §14707(b) (*See*, Complaint, ¶28), but under FMCSA's policy, if Plaintiffs are injured by unregistered competitors, it is up to Plaintiffs to seek enforcement, as they are doing here.

Each Defendant is registered with FMCSA, but only to conduct "charter and special operations" service, not the "regular route" service they are now conducting in competition with Plaintiffs. As certified to by the FMCSA itself, Defendant Fung Wah's only FMCSA registration is that at MC-405969 (Schwarz Aff. ¶12, and Ex. G).[7] Defendant Travel Pack's only FMCSA registration is that at MC-352543 (Schwarz Aff. ¶13, and Ex. H). Both registrations expressly on their face authorize only the transportation of passengers "in charter and special operations." The services Defendants actually operate are classified as "regular route." Defendants' registration to perform "charter and special operations" does not permit them to perform the "regular route" services they are now performing in competition with Plaintiffs. (Schwarz Aff. ¶¶ 12-13; Alexander Aff. ¶6) [8]

<u>"Charter and Special Operations" vs. "Regular Route" Registration</u>

Since the beginning of federal bus regulation, Congress and the federal regulatory agencies have differentiated "regular route" registration from "charter and special operations" registration. A leading early statement is *Asbury Park - New York Transit*

---

[7] "Schwarz Aff." refers to the Affidavit of Robert Schwarz, Executive Vice President of Plaintiff Peter Pan. "Ex." refers to an exhibit attached to that affidavit.

[8] "Alexander Aff." refers to the Affidavit of Gregory Alexander, Vice President, Industry Relations of Plaintiff Greyhound.

*Corp. v. Bingler Vacation Tours, Inc.*, 62 M.C.C. 731, 739 (1954) (relied upon in

*Transport of New Jersey, supra*) where the characterization of service was at issue:

> [U]nder the [Motor Carrier] act there are 3 recognized types of passenger service: (1) the ordinary day-to-day scheduled regular-route common carriage of passengers, variously referred to in the decisions which were reviewed as, "the usual operations of the ordinary common carrier," the "ordinary common carrier of passengers," "the usual operations of ordinary regular-route common carriers of passengers," the "ordinary common-carrier passenger operations," or the "usual operations of common carriers of passengers;" (2) charter operations in which a group is organized by someone other than the carrier is sold the exclusive use of a vehicle; and (3) "special" operations which are not defined but appear to include all passenger operations which do not fall in either of the other 2 cases.

More than a decade later, the ICC restated the same distinction in *Michaud Bus*

*Lines, Inc., Extension - Tours*, 100 M.C.C. 432, 443 (1966), saying,

> Distinctions have often been drawn between differing kinds of motor carrier passenger operations. Regularly scheduled, intercity bus service, provided over fixed routes and for the public at large, is at one extreme. At the other is charter service, . . . , in which a preformed group contracts as an entity for the exclusive use of a vehicle which is then operated over irregular routes at the group's discretion. In between lie what have come to be known as special operations . . . . "

Still later, in a proceeding examining these distinctions even further, the ICC

affirmed the difference between "regular route" and "special operations" service and the

importance of not allowing carriers holding special operations authority to intrude on the

business of those providing regular route service.[9] In *Passenger Transportation in*

*Special Operations, supra*, at 171, the ICC repeated its view of the distinction between

classes of services by saying, "Basically, the concept of special operations is negative.

From the beginning, it has been considered not in terms of what it is but what it is not,

---

[9] The quote from this ICC case at page 2, *supra*, makes this point. In *Transport of New Jersey, supra*, at 1121, the Court strongly makes the point of the importance of the protection of regular-route carriers from unauthorized competition.

namely, a catchall classification covering services not designated as ordinary regular-
route or charter operation."

This same distinction is well recognized today by those engaged in the business.
(Alexander Aff. ¶¶ 11-14; Schwarz Aff. ¶¶ 15-17, 28)

*New Jersey Transport, supra,* is so similar to this case that it deserves special
attention.  There, the plaintiff New Jersey Transport was registered to provide "regular
route" transportation and defendant Greyhound was operating a scheduled service
ostensibly under its "special operations" registration.  The Court held Greyhound was not
only operating in violation of its registration, but in "clear violation" as the statute
requires.  Quoting from the ICC's *Asbury Park* decision, *supra,* the court at 1119-20
analyzed Greyhound's operations as follows,

> The Commission noted in its discussion that round trip sightseeing or pleasure tours in
> special operations must include "something Substantial in addition to, or different from,
> bare expeditious transportation between two points which factor is the fundamental
> characteristic of ordinary regular-route passenger-carrier service.  Thus, if some
> "Substantial " accessorial or different service is not provided the operation must be
> classed as that of an ordinary regular-route carrier.  . . .  When, however, a carrier holding
> tour authority on a 'radial or territorial basis' undertakes to set up a tour of 1 day or less
> between 2 specific points it then becomes important that something extra and something
> Substantial be added to the bare transportation involved.  If regularity, frequency and
> expeditious service are introduced as additional factors in such point-to-point operation,
> then progressively it becomes even more important that these characteristics of an
> ordinary passenger operation not predominate in the service which is offered and
> provided to its patrons.

The service Greyhound there sought to provide under its special operations
authority was daily scheduled service to Atlantic City casinos.  The Court dismissed
Greyhound's claim that because it was serving a casino rather than a city center, it was
not regular route scheduled service, saying,

The main attraction of the Greyhound trip is not sightseeing, nor is it a meal, a lapel button or a gaming pamphlet; but rather direct, expeditious transportation to the Casino and its games of chance. The extras connected with the Greyhound trip, like the racetrack admission ticket in Asbury *Park*, are peripheral not substantial. *Id.* at 1120

For the Court, yet another defining feature was the frequency of scheduled operations:

Finally, and of special importance is the fact that Greyhound's service is provided regularly, Monday through Friday, over regular fixed routes despite its certificate's limitation to "irregular routes." The Commission has held that special service "contemplates that service rendered generally on week- ends, holidays, or other special occasions to a number of passengers which the carrier itself has assembled into a travel group . . . ." *Fordham Bus Corp. Common Carrier Application*, 29 M.C.C. 293, 297 (1941). Similarly in *Brown's Bus Service, Inc., Extension Intermediate Points*, 83 M.C.C. 261, 265 (1960), the Commission found the proposed motor carrier operation a scheduled regular route operation not a special operation because "(a)pplicant will not assemble groups of passengers for special trips, nor will it operate on an irregular or sporadic basis; rather, it will operate over a fixed route and follow a regular daily schedule." *Id.* at 1121

From these examples, it can be readily seen that there has always been a significant distinction between "regular route" and "charter and special operations" registrations, and "the violations . . . readily and obviously appear from an application of the controlling decisional guidelines which have been held to apply to the interpretation of the [Defendants' registration] by the tribunals having primary jurisdiction in the matter. There is no question that by operating in excess of the operating authority which it holds and by violating the restrictions contained therein the defendant is operating in clear and patent violation of the pertinent sections of the Interstate Commerce Act." *Bethke*, *supra*, at 1381.

The ICC decisions quoted remain in effect, and the policies embodied in them are carried forward today. For example, some of Peter Pan's earlier registrations authorize

"regular route" service (Schwarz Aff. ¶6, Exs. A,B) and some authorize "charter and special operations" service. ( Schwarz Aff. ¶7, and Ex. C). Today's policy is no different; recently issued FMCSA registrations still make the same distinction. (Schwarz Aff. ¶8, Exs. D,E)

Today's FMCSA "registration" statute, §13902, continues to refer to the different classes of service. As examples, §13902(b)(1) and §(b)(2)(A) each make explicit reference to "special or charter transportation, while §13902(b)(2)(B), §(b)(3), and §(b)(4) each make explicit reference to "regular route" transportation.

<u>Defendants Are Operating "Regular Route" Service</u>

Based on the distinctions recognized by the ICC over many decades, *supra*, it is clear both Defendants are actively engaged in "regular route" transportation. Both hold themselves out to offer and actually offer expeditious, regularly scheduled, point-to-point service between Boston and New York, available to anyone who requests it.

> Both Fung Wah and Travel Pack hold themselves out to provide direct, expeditious transportation between Boston and New York City. (Schwarz Aff., ¶16)

> Fung Wah holds itself out with a printed schedule and internet web site with that schedule.[10] (Schwarz Aff. ¶20, Ex. I; Alexander Aff. ¶8) Fung Wah offers 18 different schedules regularly spread throughout each day, every day on both its schedule and website. (Exs. I, M to Schwarz Aff.; Alexander Aff. ¶10)

---

[10] One element of Fung Wah's holding out has special relevance to the "public interest" determination. Both its printed schedule and its internet web site make reference to authorization by FHWA (even though Fung Wah's actual registration was initially with FMCSA), and its web site home page displays the "official" U.S. Department of Transportation stylized name and logo, in an obvious effort to lend legitimacy to its operations. It is misleading to the public for an entity to make reference to its federally authorized status to its benefit when it knew or should have known that it was not properly authorized.

Travel Pack holds itself out with a printed schedule and internet web site with that schedule. (Schwarz Aff. ¶21, Ex. K; Alexander Aff. ¶8) Travel Pack offers different schedules regularly spread throughout each day, every day [16 daily schedules are shown on its schedule (Ex. K to Schwarz Aff); its website advertises 18 daily schedules (Ex. N to Schwarz Aff.)] (Alexander Aff. ¶10).

Fung Wah makes its service available on an individual fare basis to anyone who presents himself for transportation. (Schwarz Aff. ¶ 20, Ex. J; Alexander Aff. ¶8).

Travel Pack makes its service available on an individual fare basis to anyone who presents himself for transportation. (Schwarz Aff. ¶21, Ex. L; Alexander Aff. ¶8).

Fung Wah operates vehicles showing its name, "MC" and "USDOT numbers. (Schwarz Aff. ¶ 22-23) Travel Pack operates vehicles showing its name, "MC" and "USDOT numbers. (Schwarz Aff. ¶ 24-25 ) Under FMCSA safety rules, the motor carrier must show its name and "USDOT" number on each vehicle it operates.  49 CFR § 390.21

All of these features show that Fung Wah and Travel Pack are engaged in what the ICC has for many decades called "regular route" transportation. (Schwarz Aff. ¶¶ 15-17; Alexander Aff. ¶11).

From the foregoing, it is evident that not only have Plaintiffs demonstrated a high probability of success on the merits - the preliminary injunction standard - they have met the higher "clear violation" standard of §14707.  The only possible conclusion is that there is a distinction between "regular route" and "charter and special operations" registration and that Defendants are registered to operate "charter and special operations" but are operating "regular route" service, beyond the scope of their registrations.

Harm to Plaintiffs - Harm to Defendants

The preliminary injunction criteria call for a balancing of Plaintiffs harm from the complained of activities against Defendant's harm if an injunction is granted.   The statutory basis for this action makes such determination a relatively simple one.

Courts hearing "private enforcement" cases have been uniform in finding that in a competitive market, if one carrier is operating without appropriate registration, then there is an obvious "illegal diversion of transportation business which the plaintiffs would have otherwise shared." *Bethke, supra*, at 1381.  Both Peter Pan (Schwarz Aff. ¶¶30, 31) and Greyhound (Alexander Aff., ¶¶ 7, 16) have reached the same conclusion.

At the same time, the nature of this diversion is such that courts recognize there is no adequate remedy at law to measure or recover such damages; by their very nature, such illegal operations call out for an injunction to put an end to the damages. *Tri-State Motor Transit v. H. J. Jeffries Truck Lines, Inc.*, 347 F.Supp. 864, 870 (W.D.Mo. 1972).

Plaintiffs' harm comes about because each has made substantial investment to put into place a system which allows effective, efficient scheduled services, (Schwarz Aff. ¶32); each operates at less than capacity, (Schwarz Aff. ¶31, Alexander Aff., ¶7); and the diversion of passengers to Defendants' unauthorized operations have impaired Plaintiffs' profits and their investments.  (Schwarz Aff. ¶32, Alexander Aff., ¶7)

While Plaintiffs suffer harm from continued unauthorized services being performed by Defendants, what harm might defendants suffer if the requested injunction is issued?  Ultimately, to the extent Defendants suffer economic harm, they are only

14

losing revenue that they were "earning" by operating in clear violation of the law.
Revenue earned only by willful violation of the law should not play a part in any
equitable relief. (Schwarz Aff. ¶33).

Further, it appears from Defendants' price structure that whatever revenue they
may lose by not operating their service, the amount of any lost profit from that revenue is
very, very small. (Schwarz Aff. ¶34)

These two factors suggest that the court should not be concerned with any possible
"harm to defendants" in reaching its determination to issue the requested preliminary
injunction.

Award of Attorneys Fees

Plaintiffs seek award of their attorney fees as allowed in §14770(c), which
provides, "In a civil action under subsection (a), the court may determine the amount of
and award a reasonable attorney's fee to the prevailing party. That fee is in addition to
costs allowed under the Federal Rules of Civil Procedure."

Such an award is especially important in a case such as this, where, in the absence
of monetary damages, it would be prohibitive for Plaintiffs to bring such an action to
enforce the law. *Tri-State Motor, supra*, at 871. The court expressed similar sentiments
in awarding attorney fees in *Bethke, supra*, at 1381.

Under the circumstances, consistent with actions in other such cases, the Court
should award reasonable attorney's fees to Plaintiffs.

For all the reasons set forth herein, Plaintiffs respectfully request that the Court issue the requested preliminary injunction and award them their attorneys fees, all as requested herein.

PLAINTIFFS

By their attorneys,

May 12, 2004

Wesley S. Chused (BBO #083520)
LOONEY & GROSSMAN LLP
101 Arch Street
Boston, MA 02110
(617) 951-2800

and

Jeremy Kahn
KAHN & KAHN
1730 Rhode Island Ave., N.W.
Suite 810
Washington, D.C. 20036
(202) 887-0037

OF COUNSEL:

Fritz R. Kahn, Esq.
FRITZ R. KAHN, P.C.
1920 N Street, N.W., 8th Floor
Washington, DC 20036
(202) 263-4152